Our final case is United States v. Barnett et al.'s Mr. Carpenter. Are you ready? May it please the Court. I represent Codefendant Samantha Williams, and I'd like to address three issues, the cross-reference, the coded language, and the Rule 29. I'll start with the cross-reference. I'll start with the cross-reference because it had such a tremendous impact on my client's sentence in this case. Even viewed in the light most favorable to the government, the evidence here shows nothing more than a conspiracy to assault Kelly Starr, not to murder her. And that distinction between assault and murder is critical. Mr. Williams is only convicted of RICO conspiracy, correct? That is correct. So do you believe that the two RICO predicates are proven in this case? I do not. That's the Rule 29 issue, and I'm happy to start there, Judge Agee, if you would like. So if you were to succeed on that, then you're happy and you go home? Absolutely. So the government's theory is that the murder conspiracy that is relevant to the cross-reference is the first of those predicate acts, and that the second set of predicate acts in the government's theory is the extortion. And so let me start with addressing the extortion argument. The government relies entirely on the reaching back memorandum to suggest that it is proven a series of extortion acts. The problem is that extortion requires a threat of physical violence, and there is no evidence in the record that failure to pay these dues, that the consequence of failure to pay would be physical violence. Instead, the reaching back memorandum that the government relies on specifically says that the sanctions to be administered would be a demotion within the gang rather than physical violence. If you don't pay your sanctions, are you out of the gang? There's really no evidence of that, either. In fact, there's only one slight piece of evidence at 1673 in a letter that suggests that one person sent in, it says, Grinch sent Sabrina $50 for reaching back. No one else did. So it seems from that that people rarely paid these dues, and there's no evidence that the consequence of it was that you were removed from the gang. So, again, our view is that there is no evidence that physical violence was a consequence, and there is no evidence, perhaps more importantly for Ms. Williams, there's no evidence that she was made aware that physical violence would be a result of failing to pay dues. The purpose of the dues were to benefit those who were so-called iced out, right, back in prison? Yes. The people iced out, I believe, referred to the folks who had been released. Released. Okay, so people in prison. All right, and so doesn't the end of the memo say, Love my shines, death to all those who go against iced out medallions? It does, and that's sort of a gang slogan, and it's, again, but that's not a reference to people who fail to pay dues. That's a reference to those who go against iced out medallions, it's people who go against the gang, more generally. It's in the memo on payment of dues, though, right? It is, but it's at the end, and if you go back to the, I believe, the page before in the memo, it specifically says, Those who cannot make this payment will be demoted, and it says, Yes, it's no longer game, you'll be demoted, and it goes, yes, it does go to the, you know, it ends with this slogan of death to all those who go against, but I don't think there's any way to read that as suggesting that failure to pay dues will result in death when the memo in the previous page specifically says that the failure to pay would result in demotion. I mean, I think in this instance, the specific controls the general. There is a specific statement in the memo. Wasn't there significant evidence at trial that if you did anything contrary to the gang that there would be some physical consequence, the whole on-the-plate notion? Certainly it is true that there was a lot of talk about gang discipline and violence, but that is, you know, in the context of the Kelly Star incident, for example, and that's a very serious violation of gang rules where a gang member has forged a document to try to take down one of the leaders of the gang, and I don't think there's anything in the record that allows an inference that a failure to pay dues is going to result in the same level of punishment as such a serious offense against one of the leaders of the gang. And again, if, and there is absolutely no indication that Ms. Williams was made aware that that was going to be a consequence of a failure to pay dues, because the key here for our client, for Ms. Williams, is what is her knowledge? Did she agree to participate in the affairs of this gang knowing that there were extortion of acts to be committed? And there's no evidence that she was aware that physical violence would result from a failure to pay these dues. You said that they'd be demoted, but that's, I presume, if you have a position within the gang, but the lower people, they were called soldiers, right? That's right. So they can't be demoted from a soldier, can they? I think the logical inference there is that they would be no longer allowed to participate in the gang. So I don't think there is, again... Subscription would lapse, basically. And there's, again, it would be very strange to say that a leader, someone who has such responsibility in the gang, would be just demoted while the lower level people would be, you know, death or physical violence or something like that. I just don't think... That does not seem to follow. You're saying that if you don't pay dues, you just won't be allowed to participate in the gang. Sure. I mean, people just don't get out of gangs. You can't just willingly say, I want to leave the gang. I think that's pretty common. Well, if you just don't pay dues, they'll just say, oh, go on about your business. You're no longer in the gang. Judge Wynn, the problem with that is that may be our guess, our best common sense inference, but there's no evidence of it in the record with respect to this particular gang. Not every gang is the same. It does say it's no longer a gang. And it says any games being played will result to sanctions being administered. You're saying the only sanction was you'd be demoted for those capable of being demoted. That's right. And more specifically, what I'm saying is there's no evidence in the record of what those sanctions were other than demotion. There's no evidence from gang members who testified that I failed to pay dues, and as a result, I was beaten up. In fact, our trial counsel asked, I believe, almost every of the gang members who testified, did you send any dues to Samantha Williams? And none of them had. So there was no evidence that she was aware of any failure to pay dues resulting in violence. Wasn't there evidence that at least one person who tried to leave the so-called G-Shine gang, or one of the gangs, was beaten? I don't recall that evidence. Pow-wows? Didn't they have beat-ins and beat-outs? There was certainly evidence of beat-ins, yes. I agree with that at the pow-wow. There was no evidence of a beat-out. And more importantly, as to Ms. Williams, there was no evidence at all that she was aware of the beat-ins or the beat-outs. In fact, no one in North Carolina really knew much about her, aside from a couple of people who'd had the interactions with her. And she knew very little about what was going on in North Carolina. What's the impact of the Ocasio case that's up before the Supreme Court? It could have a significant impact on the jury instructions here. It still has not been decided. It is, of course, a binding precedent in this court until the Supreme Court says otherwise. So we've reserved that issue. And certainly when the Supreme Court decides it, we will advance any argument we have based on it. I confess that as defense counsel I didn't get warm fuzzies from the reading of the Supreme Court transcript. It didn't sound like it's going to go great for the defense, but you never know. So should we just hold this and obey it, if it's going to affect this issue? You could certainly do that. I think it should be decided. I mean, it was argued in October. It should be decided any day now. I just checked yesterday to make sure it hadn't come out this week, and it hasn't. Your Honor, I would, with the little bit of time I have left, like to go back quickly to the cross-reference, because it had such a tremendous impact here. If the court, I hope you accept our Rule 29 argument, but if you do affirm the conviction at the very least, you should strike down the cross-reference and remand for resentencing. And I'd like to make a couple of very quick points about the cross-reference. The first is that the district court made a simple error in recalling the trial testimony, and we lay that out in our briefs. Didn't he, though, say that he was adopting for the reasons the government set forth in its brief? Doesn't that undercut that argument a little bit? He absolutely did that, and I agree. And so that's the second point I want to make, which is that in applying this cross-reference, we have to be careful to distinguish between conduct that creates at least some risk of danger to a person's life and conduct where the intent is to commit a murder. And this cross-reference only applies in that second category. But all of this other evidence, including the letters and the phone calls, it all suggests conduct in the first category. What is the evidence on the murder? Is it the, I'm looking at page 1681 of the Twin Appendix, the letter from O.G. Powerful, greetings my love, and then the transcript of the phone call with Barnett? Those are the two primary pieces of evidence the government points to. And in that respect, I would encourage the court to look closely at the June 14th call between my client and Mr. Barnett, which is the crux of the government's argument here. Again, if you keep in mind, what we need for a murder conspiracy is an intent or an agreement to murder someone. And if you look at Joint Appendix 1632 to 1634, which is the transcript of this call, it's clear from that that the intent isn't to kill her. The intent is to go and bully her into revealing information to tell them why did you do this, who put you up to creating this forgery and going against Frankie Boo. At 1633, she says, we need to find out where this came from. At 1634, she says, we need to find out, Mr. Barnett says, we need to find out why. Who's behind trying to set the big homie up? It's clear through the context of this conversation that the intent is not murder. It's to get information. And there's no reasonable find or a fact could come to no other conclusion? That's exactly right. And that's why, I mean, there is this, the question of which evidentiary standards should apply. And we think we win under either one. I would encourage the court to follow the Eleventh Circuit and kind of clarify the law on that issue. But our position is that no matter what evidentiary standard there is, even viewed in the light most favorable, we win on the cross-governance issue. What was the timing of the phone call versus the letter from Powerful? The phone call was June 14th of 2011. The letter from Powerful was September 20th, I believe. And one of the phrases in the letter says, you playing with her life. Yes. And I think that's absolutely consistent with this conduct being in that first category, where there's some risk to her life. Of course, if you send your people to bully her, to try to get information from her, there's always a danger that she retaliates, that things escalate, and that her life is endangered. But that's very different from intending from the outset to murder her. And this cross-reference only applies if that is the intent at the outset. Thank you, Mr. Carpenter. You have some rebuttal time. And now we'll hear from Mr. Gillette. May it please the Court, my name is Jeffrey Gillette, and I represent Mr. Alan Barnett. With respect to Mr. Barnett's conviction for conspiracy to commit a murder in aid of racketeering, the District Court erred by denying his motion to dismiss for insufficient evidence, because no reasonable jury could have come to the conclusion that the conspiracy among the people on the phone from the Bertie Prison was a UBN conspiracy. That is to say, he could not have been participating in that, whatever it was, to increase or maintain his position within the UBN enterprise, because it was not a UBN conspiracy, and because he actually, if it had been known to the higher-ups in the UBN enterprise, would have been putting himself, as the colloquial expression was, on the plate. The key participants in that phone conversation were members of a number of different sets. One of them identifies himself as a Pretty Tony, which is the name of a set that is not a UBN set. Another one introduced himself, maybe two of them, as BGB, or Black Gangsta Bloods. They also are not a part of the UBN enterprise. Now, why would I say that? Well, the indictment in paragraph 15 and in paragraph 33N of the superseding indictment, these organizations or sets, the Pretty Tonys and the BGBs, were not a part of the UBN, and it became a bone of contention when the leader of the state UBN set tried to bring these people in, and it went up to New York, and the leader of the UBN network said, not only are these sets not a part of us, if anybody associates with them and identifies with them, that person is on the plate. Well, that's exactly what was going on in this telephone conversation. Mr. Barnett was identifying and associating, and the whole purpose of the conversation was to provide support for these non-UBN set members in terms of the activities that were taking place on the air. In your view, he was acting so far outside the scope of his UBN authority as a major figure in that group that no reasonable person could conclude that his actions here could  be justified. Judge Asia, I could not say it better myself. And that, I think, brings out a substantial problem that keeps popping up, both in this and also in my argument related to this. Well, if he is, though, an authority figure, which I think the record shows, and part of maintaining his aura of leadership is to show that he's a decisive leader, and I think he's a decisive figure, even if he made mistakes of facts as to whether or not this was something the O.G. Powerful would approve, could he not have perceived that this was necessary for him to act in order for the aura of his leadership to continue to spread? I do not believe that he could have made that action within the scope of the Vicar of 18 U.S.C. 1959. Because the, and I believe, to go back to the beginning of your question, a reasonable jury could find, as the government does indeed suggest, that he was enhancing or maintaining his own position as a leader among many of these people in participating in the conversation. However, 18 U.S.C. 1959 requires that he has to be enhancing his position within the enterprise. And as I believe it was Neapolitan that said that the government is the master of the indictment in setting out the scope of the enterprise, and the enterprise here clearly is U.B.N. And what he is doing, he clearly knows, is contrary to U.B.N. policy. He's been told that anybody who does what he's doing is on the plate. So perhaps he could have been, a reasonable jury could have believed that he was enhancing his own position, but it wasn't a U.B.N. position, and it had nothing to do with the racketeering enterprise that he was indicted for, and it was mentioned specifically in this count of the indictment. And that does bring up the different conspiracies that are kind of thrown together here. There were many people who are affiliated with U.B.N., and there were many people who were not. And Mr. Barnett could conceivably be found by a jury to be participating in multiple conspiracies. And as we know, multiple conspiracies do not satisfy in and of themselves a RICO indictment. And so we asked this court to look specifically to the U.B.N. enterprise, and in this particular count at least, whatever it is that Mr. Barnett was doing bore no relationship to the U.B.N. enterprise, and could not therefore have enhanced his position. It could only hinder it. I see my time is up. If the court has any other questions. Thank you very much, Mr. Gillette. You've got some rebuttal time as well. Ms. Ray, you don't have to sit there today. You get to talk today. Thank you, Your Honors. I guess I'll start with subject to any particular areas of issues that you want to talk about. I'll begin with the evidence against Ms. Williams, which is sort of where Mr. Carpenter began. I think there are three categories of evidence, and of the Joint Appendix, Officer Brogdon is testifying, and he's the one who surveys that powwow. And he says that Barnett was disciplining a fellow gang member, and if you want out, this is the way you get out. And he was talking about a beating that he was concerned was going to be deadly, so he sort of moved positions to make sure that that beating just was a no-brainer. If you're going to get out of the gang, you're going to be beaten out. And in turning specifically, though, to Ms. Williams... What's your best evidence of the extortion? Is that it? No, no. I mean, that's part of... I think that goes to her understanding. So there's several things. That is the fact that there's one way to get out of this gang, and then with respect to extortion, obviously we have the reaching back memo and the reference to death to all the homies who don't support it. We have a reference to sanctions being administered. But in addition to that, we have... I don't think it should be underappreciated the extent to which Ms. Williams was a leader in this gang. She was O.G. Powerful, Daryl Wilkinson's voice. And if I would refer your honors to pages 1100 to about 1170, but as we go through there, her cell phone, she has contacts with UBN members in Houston, New York, Raleigh, Baltimore, Rhode Island, Connecticut, New Jersey. She has hundreds of text messages just within a few months' period of time with David Jenkins, who was the leader down in South Carolina, who at one point was the one who was going to take action against Frankie Boo or Franklin Robbs. And that was pulled back when they found out that Kelly Starr had made the whole thing up. There were text messages to Kimmy Cook, who was Gangsta Woo in Virginia, 142 within a five-month period of time. In other words, she is deeply enmeshed in the details. Some of those text messages are members of the gang from, for example, New Jersey saying, look, the family needs direction. We need you to tell us what to do. So this is not an individual, and the jury could reasonably infer from all of that, that she was aware of the sanctions that would be put into place. And Maurice Robinson testified. He was sort of the chief operating officer of the corporate structure. Because Daryl Wilkinson was in prison. And we also had testimony about the limitations that he was under. Now, we happen to know that apparently there are very few limitations on prisoners in Bertie who are able to conduct a multi-person conference call. But the testimony from the prison officials in New York was that Mr. Wilkinson's communications were quite limited. And they intercepted, for example, they didn't even let Barnett meet with him when he went up. And so he needed Samantha Williams. And Samantha Williams was the person. Maurice Robinson testified that he heard Williams on the phone with Barnett. And he heard it on the speaker phone that she gave the order that was the order of Wilkinson. But she conveyed it to put Kelly Starr on the plate to make her food. So through all of these things, I think you can get that Samantha Williams understood that the consequences and the 31 rules, both Camps and Barnett, pardon me, Robinson testified about the 31 rules. What happens when you don't follow the directions of your superior? You are, you're put on a plate. So I think all of that, from all of that evidence, one can certainly conclude that Samantha Williams agreed to at least two racketeering acts. We don't have to show that she actively participated in any two racketeering acts. She agreed to  Did Ocasio change the result of this case? At least your analysis? I mean, I, maybe. And I think that I have no problem if the court wants to hold this case in abeyance pending that. And I think that if the opinion were to suggest that it does have an impact, supplemental briefing would be appropriate. But I think under this court's case law at this moment, we, we've proven and provided more than ample evidence that Samantha Williams agreed to participate in an organization. There's a case from this circuit on direct appeal to the Supreme Court now, and it has this issue of whether you can internally extort. That's pretty pivotal to what we have to decide here. And I don't have any, I don't, we didn't move to hold the case in abeyance, but if the court thinks that that's the appropriate I believe if we did, that'd sound like it should be long, given the amount of time it's been. What about the conspiracy to murder Kelly Stock? So we have It looks like, I'm just cutting straight to where I'm going with this, it looks like the name, you could probably say she agreed to assault, but the murder looks a little flimsy in terms of the evidence for her having done that. So I guess I would respond to that with a couple of things. First of all, that goes to only the sentencing issue, and not, not her guilt. And on that, there, the government's best evidence, we are of course relying on Daryl Wilkinson's letter to her that you put her, you're playing with her life and the life of her kids, black roses refers to death. We also have Maurice Robinson's testimony that Barnett said she was a hit. We have the fact that Maurice Robinson testified that that came straight out of William's mouth. And I think that we, and, and we have the fact that, that there's a reference to Marshall's having been sent out to Kelly Starr's house. Now, would it be possible for a fact finder to review all of that evidence and determine that she had only actively participated or agreed in, to an assault? Perhaps. That would have been one way to view the evidence. But I think a, a, a fact finder such as Judge Whitney in this circumstance could also conclude from this evidence that she conspired and understood that Kelly Starr would be killed. And that that was, she agreed, she entered into an agreement that that would happen. I also want to suggest to the court that although Judge Whitney applied the beyond the reasonable doubt standard, the case law on that question of what the burden of proof was heavily weighs in favor of this court's, I, I think it just, the reasoning of the courts that have held that a judge may, only needs to find by a preponderance the predicate acts of a RICO conspiracy for determining the, the offense level, that that is the better reason, decisions. Because the idea is that predicate acts are not objects of the conspiracy in the same way that a multi-object conspiracy is. And I would refer your honors to the, to all of those decisions. I also want to note that since this was, case was briefed, the Third Amendment, 16 Westlaw, 192652. And I apologize that I didn't get that in a 28-J letter. I just found that last night. What, what about the District Court Judge's statement something to the effect of being put on the plate means assassination? Right. I mean, I don't, we don't rely on that. I don't, he said that, yes. Which on the one hand means that he actually found that, I mean, that, that is part of what he considered. But that is one of the possible ways, it's one of the possible consequences to being put on a plate, is that one is killed. And a number of witnesses testify to that. The government concedes that. The witnesses also testified that that wasn't the only consequence. And Judge Whitney's statement could be read to suggest that that was true. But I don't think that that undermines the facts that support the ultimate determination. And this court's job is to determine whether or not those facts exist, not whether or not Judge Whitney's reasoning was, was without any flaws. So in this case, the government's evidence was more than sufficient, both under preponderance of the evidence, certainly. And we suggest that the preponderance of the evidence is the appropriate standard that a, a district judge could reasonably conclude that she intended and conspired to, to commit murder. To get there, you've got to get to the sufficiency of the evidence beyond the, beyond the reasonable doubt standard, though, as a predicate act, do you not? No, I don't think so, Your Honor. To get, what I'm saying is that it, the preponderance of the evidence standard is the appropriate standard that applies. And this court hasn't reached that decision, but of the other courts that have, they overwhelmingly hold that only a preponderance of the evidence standard. Judge Whitney applied beyond a reasonable doubt out of really an abundance of caution in case that was the, the conclusion this court reached and found that it met that standard. But that issue of which standard applies is one of the issues before the court in this case. So you're saying if, if we find sufficient predicate acts for the Rico conspiracy, but she can still be sentenced for the murder evidence based on a preponderance standard? Yes, sir. The cross-reference could be applied based on a preponderance of the evidence standard if this court were to agree with, I, the 7th, 2nd, 3rd, 1st, the other circuits. What is the other predicate act or acts that you're relying upon other than extortion and murder? Well, we would... For Williams. Right. For Williams on the conviction side of it, we would suggest that also there was plenty of evidence that both drug robberies, robberies, specifically drug robberies, as well as drug trafficking. The opposing counsel says you didn't argue that at trial. Well, I don't, we certainly presented a lot of evidence that those... Right, but did you argue that? I don't remember whether or not we specifically argued in closing argument that those predicate acts could support her conviction, but I don't think that whether we argued that or not is determinative of whether this court can uphold her conviction under Rico. I mean, if the evidence that we presented at trial satisfies that, those predicates, and we don't, we don't need that. I really think that we have plenty of extortion and we do have the murder, but we also have evidence that the way these folks supported themselves was through drug trafficking and that they then used that money to pay their dues, and there was evidence in the record about that. Were those listed on the jury verdict sheet? They... I know they weren't counted separately, but were they listed? I believe so. They were not, there was no special verdict where they had to find which one it was, but it was listed in the indictment and I'm pretty sure, I glanced at the verdict sheet last night, that wasn't something that I was really paying very close attention to, but there was a pretty long list there. So, did the indictment for Ms. Williams on the Rico conspiracy list out the predicates and that included robbery and drugs? Yes, yes, it did, and that is on, it's on page 120 of the joint appendix. The acts of racketeering that are alleged are murder, bribery, robbery, controlled substances, offenses, and Hobbs Act robberies, and that is alleged in the indictment, that's charged, and that was part of the, as the predicate acts for this Rico conspiracy. So, we think that there is plenty of evidence to support the conviction against Ms. Williams, as well as evidence to support the cross-reference, particularly under a preponderance standard, but even... Evidence of the, that she agreed to the general acts of robbery, of the drug trafficking? Just the fact, our best evidence on that comes from Maurice Robinson and Camps, those were the two UBN members who, well, two of the UBN members are primary witnesses, and they both testified that those are, that's kind of the way they make their living, and also, and that that's how they pay their dues. In addition to that, all of that evidence that we put in about the extensive nature of Ms. Williams' contacts and direction to, she would have known. So you have no direct evidence of it, you have just... Correct. It just looks bad. Well, I think that circumstantial evidence, it's not just that it looks bad. Could a jury... It's pretty much just that it looks bad, because you have not one of them saying she agreed to it. No, our evidence with Samantha Williams, without question, is mostly what comes from either the letters, none of which specifically said go out and deal drugs and go out and engage in robberies and licks to support this. That's all looking bad. I disagree, but maybe that's just a question of semantics, Your Honor. I personally think that if we provide evidence that she is running this gang, running this gang... In other words, she's associated with the gang, that's enough, in your view. No. Well, if she conspired to agree, to conspire that two acts would be committed, that's enough. And she was running and managing a gang from New York that everyone that they testified, this is how they made their living, this is how they paid their dues, they would be directed in some instances by superiors to engage in criminal acts, including robbery. And so that evidence is sufficient to support the jury's verdict. Remember, this is on a sufficiency of the evidence. Could any reasonable jury have concluded that she conspired to commit two predicate acts? Just two. And we have her... Also, there's evidence, and I just want to hit this very quickly, but there's evidence about the assault that was going to take place on Dred in South Carolina that she was involved in and then told them, no, Wilkinson wants you to pull back and come up and meet with him. And so I respectfully suggest that there's more than enough evidence given her extensive management. She said Wilkinson wants them to pull back. What does that support? It supports the fact that she was aware of an order to at least assault, but also the implication is to murder. Sure. If that was already in place, that was an action that was underway, she knew about it, and then she steps in and says, wait a minute, we're not going to do that. But she agreed to it. She was part of that. She was aware of it and agreed to it. But we don't need that. We have the evidence of extortion. We have the evidence that she was the leader. And I guess, like I said, I would look at pages 1100 or so where we talk about the joint appendix where there's evidence about all those text messages. It's hard to read those text messages and not conclude that Samantha Williams knew exactly what was going on in this gang and that she, in fact, was leading it. Addressing briefly Barnett's assertion that he did not conspire to murder because those folks were Pretty Tony or BGB, Barnett himself says on that call, Pretty Tony is Shine. That's what he says. Pretty Tony is Shine. So Barnett was considering them to be part of the UBN. He was clearly a leader of the UBN. And other members of that call were UBN. Is his subjective belief that these were acts that would further his prominence are sufficient even if it violated the UBN bylaws? Sure. I think it's evidence that goes to the fact that this was his purpose in ensuring that the order to eat DeRay Jackson, that that was part of maintaining his position within that gang. Absolutely. And there were members on that call, as I was just about to say, that were UBN without question, not just Pretty Tony or BGB, but there were members of both, of all three. So this was a gang action. This was a gang action that Barnett participated in and that whole call to Barnett, it's apparent if you read the whole thing that the purpose of it was to get him to sort of say to nasty Nathaniel Graham, you got to do this. This is what you've been ordered to do. You have to do it. I don't want to not address, in particular, the lay witness issue, if your honors have any questions about that. I think that our evidence was that Parker, Robinson, and Camp, Parker was directly involved in the investigation. This court's decision in Perkins says that that's enough. But even if it weren't, I would refer your honors to Maurice Robinson, Camp. Both of them testified to all of the relevant terms. And that was not during any testimony when they were actually interpreting phone conversations. And if you take that key... There were a couple instances where it appears that they were asked to, in effect, translate discussions, and that would appear to be error. I don't necessarily... You say it's harmless. Well, I actually don't agree that it's error, your honor. But if it is, it's harmless. Because if you take the key that they gave us with all of the definitions, which we're not actually interpreting, and you put that key on those telephone calls and other things, you can translate very easily. And even if you didn't know what any of those words meant, you could understand what was being said. This is not, as defense counsel suggested, Spanish. The vast majority of the words in those calls are English. And then those that aren't, you can interpret in context. And even if you couldn't, you could look at that testimony of Camps and Maurice Robinson that did not depend on interpretation of a phone call and get to the same place. Your honors, we respectfully request that the court affirm the district court's judgment. Thank you. Thank you very much. Mr. Carpenter. All right. I'm going to try to hit several issues on both the extortion and the cross-reference. First, the fact that Ms. Williams had a lot of knowledge and connections to these gang members simply isn't enough. Under the Mouzon case from a few years ago, the court made clear mere association with an enterprise isn't sufficient for a RICO conspiracy. We committed. So the fact that, you know, otherwise the problem we'd have is that every girlfriend of a gang member, every wife of a gang member would be a RICO violator as well. And that's just not what the law is. On extortion specifically, I want to touch on the death to all reference in the reaching back memorandum. One thing I would point out that wasn't at the top of mind when I was first up here is that if you look at that memorandum, that death to all, it is a slogan that is essentially in the signature block of the memorandum. So you have the body of the memorandum saying, you'll be demoted, sanctions will be administered. And then at the end, this death to all who go against us is sort of included as part of the signature block. I don't think there's any way to read that reasonably to infer from that that this death to all has anything to do with the body of the memo. I think it's best read and only reasonably read as just part of marketing slogan. Exactly. I think that's right. And I also want to touch on the robbery and the drugs. Those were, they were included in the indictment, but there is just no evidence that she was aware of any of that. And I think my friend, Ms. Ray, was fairly candid that if you read the letters, if you read the calls, there are four calls, the transcripts are all in there. Nothing in any of the calls she was involved in has any reference at all to go commit a robbery for the gang, go deal drugs for the gang. She has no awareness of it. She can't be responsible for that predicate under the way the state of the law moves on. I want to touch on the cross-reference issue with the murder. Ms. Ray referred to the fact that Mr. Robinson used the word hit, but if you look at the evidence, it's very clear that he equated that word with discipline, not with murder. So at page 283, he said, or excuse me, at page 479 of the drone appendix, he said she was food, she was to be hit. He's equating that with discipline, and he says at page 431, nine out of ten times, it's just a fight, unless there's a specific reference, somebody tells me to do more than beat you up. It's generally just discipline. No reasonable back-finder could determine the reference to hit meant anything other than an assault. Exactly, and that's corroborated by... Why is that? Because both Detective Parker and Gang Member Robinson both equated hit with discipline in this context. Detective Parker's testimony is at Joint Appendix 283, and he says when someone is food, the member will carry out the hit on that person, and he testifies very clearly at Joint Appendix 282 and 283, those terms mean discipline or punishment, and at page 358 and 359, he agrees they do not mean murder. So the evidence here suggests very clearly that they do not mean murder. I also have a couple of points on the cross-references I'm happy to provide. I see my time is out. Thank you very much, Mr. Carpenter. Mr. Gillette. Your Honor, it's just briefly on Ms. Ray's point that Mr. Barnett subjectively believed that he was about gang business. I suppose that's one possible way of interpreting this. It's also possible that Mr. Barnett knew that he was deliberately going against the directives higher up, but figured because of his position, the people would go along with him. Either way, I'll point the Court's attention to the Umania case, which requires in the context of someone seeking to bolster or maintain his position in the enterprise, the enterprise needs to know about it. That is to say, he needs to be in some contact and there needs to be some sort of quid pro quo, and clearly the enterprise, the UBN enterprise, had they known what Mr. Barnett was saying, they wouldn't really care whether he subjectively thought he was right or whether he was in fact misleading the people. The enterprise would have made him food, and so he could not possibly have been in the context of BICAR of 18 U.S.C. 1959, maintaining or increasing his position in the UBN enterprise. Now perhaps in other sorts of conspiracies and in other sorts of relationships, he may have felt this was to his advantage. I'm sure that's true. But in the context of the indictment that the prosecutor maintained his position with, he was going against everything that had come down from on high. That would be my only point. If there are no further questions, I ask this Court to vacate the conviction with respect to the 18 U.S.C. 1959. Thank you, Mr. Gillette. We do note that your Court appointed in this case, and the Court wishes to express its appreciation for your excellent work here, as well as the excellent work of other counsel. But thank you. All right, I'll ask the Clerk to adjourn Court, and we'll come down and re-counsel. This Honorable Court stands adjourned. Sign a die. God save the United States and this Honorable Court.
judges: G. Steven Agee, James A. Wynn, Jr., Thomas D. Schroeder